# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

COTY TYLER HALL                                                                    PLAINTIFF


v.                                    NO. 3:15-cv-00394 PSH


CAROLYN W. COLVIN, Acting Commissioner                          DEFENDANT
of the Social Security Administration


### MEMORANDUM OPINION AND ORDER


Plaintiff Coty Tyler Hall ("Hall") received supplemental security income benefits as a child. When he turned eighteen years old, his eligibility for benefits was reviewed by the Acting Commissioner of the Social Security Administration ("Commissioner") pursuant to the rules for determining disability in adults who file new applications. The Commissioner determined that Hall was not disabled under those rules as of March 31, 2013, and terminated his benefits. The decision to terminate his benefits was upheld following a hearing before a state agency disability hearing officer.

Hall filed a new application for benefits. The Commissioner denied the application following a hearing before an Administrative Law Judge ("ALJ").

Hall then commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, Hall challenged the ALJ's findings that formed the basis of the Commissioner's decision to deny Hall's new application for benefits.

Hall maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers what appears to be two reasons why.[1] Hall first maintains that his residual functional capacity was not properly assessed because the concrete consequences of his physical and mental impairments were not adequately evaluated.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's credibility regarding her subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ makes that evaluation by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

---

[1]

The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011). This standard allows for the possibility of drawing two inconsistent conclusions and embodies a zone of choice within which the ALJ may decide to grant or deny benefits without being subject to reversal. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994).

The medical evidence relevant to Hall's physical impairments reflects that he injured his left shoulder playing football. See Transcript at 954.[2] MRI testing revealed a small tear in his shoulder. See Transcript at 551-553. Surgery was performed to repair the tear, followed by a period of physical therapy. See Transcript at 517-549. The progress notes from subsequent examinations reflect that his condition improved over time, and he eventually regained full range of motion in his shoulder. See Transcript at 558-565, 871-874. Although Hall complained of shoulder pain in July of 2013, the attending physician observed that the pain returned when Hall began lifting weights. See Transcript at 873. No abnormalities were observed, and the physician recommended only physical therapy. The following month, the physician observed that Hall was "doing everything he wants to do." See Transcript at 872. By September of 2013, Hall was found to have full strength and tone in his upper extremities. See Transcript at 789.

The medical evidence relevant to Hall's physical impairments also reflects that he has experienced foot pain. See Transcript at 709-710, 787-790, 803, 867, 892. In February of 2013, he was diagnosed with pes planus, i.e., flat feet; tarsal tunnel syndrome; and post tibial tendonitis. See Transcript at 867. The following month, he was fitted with arch supports and orthopedic footwear. The progress notes from subsequent examinations reflect that his stance and gait were routinely steady and regular, and he had normal

---

2

Two points are in order. First, the relevant time period is from April 1, 2013, i.e., the day after the agency terminated Hall's benefits, through September 1, 2014, i.e., the day of the ALJ's decision. Evidence that pre-dates the time period will only be considered in placing Hall's impairments in a proper context. Second, the pagination of the transcript is not in chronological order.

strength and tone in his lower extremities. See Transcript at 690, 709, 789, 853, 865. A nerve conduction study performed in September of 2013 revealed no evidence of myopathy or radiculopathy in his right lower extremity and no evidence of peripheral neuropathy in either lower extremity. See Transcript at 784.[3]

The non-medical evidence relevant to Hall's physical impairments reflects that he was born on November 30, 1994. See Transcript at 951-952. Hall testified before a state agency disability hearing officer in June of 2013, and a summary of Hall's testimony reflects that he reported being able to lift up to thirty pounds before experiencing pain and he experiences foot pain only after physical activity. See Transcript at 933-9435. At the time, he was working out about one hour and forty minutes every other day. His work-out regimen was summarized as follows: "He walks or jogs thirty to forty minutes, then stair climbs if he can and tries to do abdominal crunches for five to six minutes before lifting weights for the remainder of his work-out." See Transcript at 934.

In Hall's disability documents and his testimony during the April of 2014 administrative hearing, he reported greater physical limitations than he reported during the state agency disability hearing. He represented that he is capable of walking for exercise but can only walk one-half mile before requiring rest. See Transcript at 138, 960. He is capable of helping out around the house and can perform such activities as

---

[3]     The record also contains an October of 2014 progress note by Dr. Bryan Glenn, D.P.M., ("Glenn"). See Transcript at 892. The note was subsequent to the ALJ's decision and was not considered by the Appeals Council because the note was "about a later time" and did not "affect the decision about whether [Hall was] disabled beginning on or before September 19, 2014." See Transcript at 8.

doing laundry, mowing grass, and washing dishes. <u>See</u> Transcript at 54, 134, 135, 958, 979. He can pick up something "just regular, like let's say [a] microphone" or a gallon of milk but has trouble lifting something "really heavy …" <u>See</u> Transcript at 971. It appears that he was taking over-the-counter medication for his shoulder pain, <u>see</u> Transcript at 971, and the medication was "sometimes" helpful, <u>see</u> Transcript at 955.

The medical evidence relevant to Hall's mental impairments reflects that since a young age, he has experienced depression and anxiety and suffered from problems associated with hyperactivity and anger. In February of 2013, Hall began seeing Dr. Cori Dyson, M.D. ("Dyson") for complaints associated with those impairments. <u>See</u> Transcript at 685. She diagnosed an attention deficit/hyperactivity disorder and a depressive disorder and prescribed medication and counseling. Dyson continued to see Hall and continued to diagnose mental impairments. <u>See</u> Transcript at 689-691, 692-693, 865-866, 863-864, 861-862, 858-860, 852-854, 848-849, 846-847, 844-845, 839-840, 837-838. During the course of seeing Hall, Dyson also began diagnosing an unspecified intellectual disability and an oppositional defiant disorder. <u>See</u> Transcript at 842. She continued to prescribe medication and recommended techniques he could use to help control his anger.

During the course of seeing Hall, Dyson authored a "To Whom It May Concern" letter. <u>See</u> Transcript at 684. In the letter, she recommended that he continue to receive his "disability at this time due to his poorly controlled symptoms of ADHD and fairly significant immaturity in addition to oppositionality." <u>See</u> Transcript at 684.

In February of 2013, Dr. Suzanne Gibbard, Ph.D. ("Gibbard") saw Hall for a consultative mental diagnostic evaluation. See Transcript at 636-640. Gibbard observed that Hall's grooming, hygiene, and dress were neat, and his mood and affect were normal. He had a normal range of expression, and his thought processes were logical and relevant. He was taking prescription medication for, inter alia, hyperactivity and anxiety. Gibbard diagnosed a depressive disorder, an anxiety disorder, attention deficient hyperactivity disorder, oppositional defiant disorder, and a learning disorder. With respect to the effects of his mental impairments on his adaptive functioning, she observed that his activites of daily living were largely routine for a man his age. He was not driving but could attend to his personal care, help with household chores, stay compliant with his medication, and participate in social activities. Gibbard also observed the following:

> [Hall's] communication skills are within an adequate range …

> He has the capacity to cope with mental cognitive work demands but [his] learning difficulties and … [d]yslexia could make the completion of tasks difficult.

> Some problems were noted with [Hall's] ability to sustain concentration in the area of Digits Forward and Digits Backward.

> He may have problems with the capacity to sustain completion of tasks and completing them in a timely manner because of his depression, anxiety, attention and oppositional symptoms.

See Transcript at 639-640.

In July of 2013, Dr. Kristin Addison-Brown, Ph.D. ("Addison-Brown") saw Hall for a neuropsychological evaluation. See Transcript at 775-779. She found that he exhibited "overall low average intellectual skills" and "strong evidence of attention deficit/hyperactivity disorder." See Transcript at 775. She found, though, that his emotional distress appeared to be well-controlled, and his depression and anxiety did not appear to be "terribly outside the normal range." See Transcript at 775. Addison-Brown diagnosed attention deficit/hyperactivity disorder, a reading disorder, and dysthymia.

In January of 2014, Dr. Christopher Bassin, Psy.D. ("Bassin"), saw Hall to assess the severity of Hall's neurocognitive and/or neurobehavioral symptoms. See Transcript at 875-883. Bassin diagnosed "Frontal Dysexecutive Syndrome," an attention deficient/hyperactivity disorder, and a mood disorder. See Transcript at 881. Bassin did not provide concrete examples of how Hall's mental impairments impact his adaptive functioning, but Bassin did provide the following summary of his findings:

> Overall, while Mr. Hall does possess many areas of intact cognitive functioning and fundamental abilities, …, the prominent and pervasive executive dysfunction also revealed by the current evaluation … currently impede[s] his ability to adequately organize, marshal, and apply many of these abilities to function effectively without significant supervision or direction. These executive functioning impairments are manifest in many ways for Mr. Hall, perhaps most notably in the lack of appropriate autonomous, adaptive functioning that we would expect to see in an individual Mr. Hall's age. …

See Transcript at 881.

On the basis of Bassin's observations, Dyson authored a second "To Whom It May

Concern" letter in April of 2014. <u>See</u> Transcript at 884. In the letter, she opined that Hall had skill sets that needed improvement before he could adequately function in the workplace. It was her opinion that "[a]t the present and in the foreseeable future, [Hall] does not have the ability to maintain gainful employment." <u>See</u> Transcript at 884.[4]

The non-medical evidence relevant to Hall's mental impairments reflects that he has trouble with "focus, concentration, completing tasks, and is easily distracted but his medication helps with these problems 'a great deal.'" <u>See</u> Transcript at 934. He reported that the barriers preventing him from working included "being a high school senior, hyperactivity, decreased focus, and anger problems." <u>See</u> Transcript at 934-935. At the time, Hall was living with his grandmother, grandfather, an uncle, an aunt, and two cousins. He was taking daily medication for his attention deficit/hyperactivity disorder, and the medication was helping him remain focused and attentive. The state agency disability hearing officer noted that Hall reported "'[zoning] out every so often' even on his medication but not as bad without it. [Hall] stated that his medication helps [ninety-nine percent] and he would be a lot worse without it. His prescription also helps his anger and stress." <u>See</u> Transcript at 934.

In Hall's disability documents and his testimony during the April of 2014

---

4

       The record also contains the following documents relevant to Hall's mental impairments: (1) a "To Whom It May Concern" letter from Dr. Daniel Gilchrist, Ph.D. ("Gilchrist") dated November 30, 2014, <u>see</u> Transcript at 887; (2) two progress notes prepared by Gilchrist dated December 10, 2014, and January 8, 2015, <u>see</u> Transcript at 885-886; and (3) three progress notes prepared by Dyson dated September 19, 2014, October 16, 2014, and November 25, 2014. <u>See</u> Transcript at 888-891. The documents were not considered by the Appeals Council because the documents were "about a later time" and did not "affect the decision about whether [Hall was] disabled beginning on or before September 19, 2014." <u>See</u> Transcript at 8.

administrative hearing, he reported being in general education classes in school, save special classes in math and reading, and making acceptable grades. When asked what he intended to do after high school graduation, he reported that he was considering attending a vocational college and pursuing training in graphic design. Hall socializes with friends and occasionally will have a friend spend the night. He has never attempted to find a job, noting that he has difficulty with "irritation …, or forgetting something or my anger or just being distracted easily." <u>See</u> Transcript at 960. He attributed some of his anger to the loss of close relatives, including his father. Hall becomes angry when he is bothered or when he cannot remember something.[5]

The ALJ found at step two of the sequential evaluation process that Hall has severe impairments in the form of an attention deficit/hyperactivity disorder, left shoulder pain, generalized anxiety, a major depressive disorder, an oppositional defiant disorder, and a learning disorder. The ALJ assessed Hall's residual functional capacity and found that he is capable of performing light work but is limited to lifting and/or carrying no more than twenty pounds occasionally and ten pounds frequently, standing and/or walking no more than six hours in an eight hour workday with normal breaks, and sitting no more than six hours in an eight hour workday. The ALJ found that Hall's residual functional capacity is also restricted in the following respects:

In addition, [Hall] must avoid working at unprotected heights or around

---

[5]

Hall's grandmother testified during the administrative hearing. <u>See</u> Transcript at 976-983. Her testimony supports the representations made by Hall.

moving or dangerous machinery and hazards. Due to his mental symptoms, [he] should avoid working with the general public. Furthermore, the work must be limited so that interpersonal contact is incidental to the work performed, the complexity of one to two step tasks is learned and performed by rote, with few variables and little judgment, the supervision required is simple, direct, and concrete. The work must be limited to Specific Vocational Preparation … 1 and 2 jobs that can be learned within 30 days. Lastly, the work must be limited to Reasoning Level 1-2 work.

See Transcript at 23. In so finding, the ALJ accorded considerable weight to Gibbard's opinions, some consideration to Bassin's opinions, but little weight to Dyson's opinions.

The ALJ could and did find that Hall has limitations caused by physical and mental impairments. The question for the ALJ was the extent to which they impact Hall's residual functional capacity. The evidence is conflicting on that question and is capable of more than one acceptable characterization. Substantial evidence on the record as a whole supports the ALJ's characterization of the evidence and the assessment of Hall's residual functional capacity. The Court so finds for two reasons.

First, the ALJ adequately considered the evidence relevant to Hall's physical impairments. With respect to Hall's shoulder pain, the evidence indicates that the tear in his left shoulder eventually healed, and he regained full range of motion. Any shoulder pain he has experienced appears to be caused by lifting heavy weight. His daily activites do not suggest more than a moderate limitation in his ability to lift and/or carry as he was able to, inter alia, engage in vigorous exercise and help with household chores after his shoulder injury.

With respect to Hall's foot pain, there are few medical findings to support his

complaints of pain. For instance, a nerve conduction study revealed no evidence of myopathy or radiculopathy in his right lower extremity and no evidence of peripheral neuropathy in either lower extremity. He benefits from arch supports and orthopedic footwear, and his stance and gait are routinely steady and regular. He has normal strength and tone in his lower extremities. The non-medical evidence also belies his complaints of disabling foot pain. Although he maintains that he is capable of only walking one-half mile before requiring rest, he testified during the state agency disability hearing that he can walk or jog for thirty to forty minutes at a time.

Given the foregoing, the ALJ could and did find that Hall has a moderate limitation in his ability to lift and/or carry and only a minor limitation in his ability to stand and/or walk. The ALJ crafted an assessment of Hall's residual functional capacity that conformed to those findings, and Hall has not shown that the ALJ erred in doing so.

Second, the ALJ adequately considered the evidence relevant to Hall's mental impairments, and the ALJ could weigh the conflicting medical opinions as he did. With respect to Hall's learning disorder, the evidence indicates that the disorder causes no more than moderate limitations. For instance, Bassin opined, in part, that Hall "possess[es] many areas of intact cognitive functioning and fundamental abilities ..." Bassin's opinion is consistent with Addison-Brown's opinion and is consistent with Hall's grades in school, which were acceptable while taking primarily regular classes, and his desire to attend vocational school after graduation.

With respect to Hall's depression and anxiety, the evidence indicates that they

cause no more than moderate limitations. For instance, Addison-Brown observed that Hall's emotional distress appeared to be well-controlled, and his depression and anxiety did not appear to be "terribly outside the normal range." Gibbard observed that Hall's activites of daily living are largely routine for a man his age. Although he does not drive, he can attend to his personal care, help with household chores, stay compliant with his medication, and participate in social activities. Gibbard also observed that Hall's communication skills were within an adequate range, and he was capable of coping with the mental demands of work. Hall takes medication which helps control his stress.

A fair reading of the record indicates that Hall's attention deficit/hyperactivity disorder and oppositional defiant disorder give rise to his greatest difficulties. The ALJ could and did find, though, that the difficulties are not disabling, and his finding is supported by substantial evidence on the record as a whole. For instance, as the Court has repeatedly noted, Gibbard observed that Hall's communication skills were within an adequate range, and he was capable of coping with the mental demands of work. Hall takes daily medication for his symptoms, and the medication helps him remain focused and attentive. He specifically noted that the medication helps ninety-nine percent, and he would be "a lot worse without it." Hall lives with his extended family and participates in social activities. Those activities include riding around with his friends and going to a house to "play a game or two and then just [coming] back to my house and talk or watch a movie [or] something." See Transcript at 956.

Hall faults the ALJ for the manner in which he weighed the various medical

-12-

opinions. It is the ALJ's role, though, to resolve conflicts among the various opinions. <u>See</u> <u>Bentley v. Shalala</u>, 52 F.3d 784 (8th Cir. 1995). The ALJ may reject the conclusion of any medical expert if "inconsistent with the medical record as a whole." <u>See</u> <u>Bentley v.</u> <u>Shalala</u>, 52 F.2d at 787. The manner in which an ALJ resolved a conflict will be disturbed only if it falls outside the "available zone of choice." <u>See</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir. 2006) [internal quotation omitted]. A decision is not outside the "available zone of choice" simply because the court may have reached a different conclusion had it been the finder of fact. <u>See</u> <u>Id</u>.

In this instance, the Court cannot say that the manner in which the ALJ resolved the conflicts among the various medical opinions was outside the "available zone of choice." Dyson's opinions are inconsistent with the record as a whole and encroach upon a matter reserved exclusively to the ALJ. <u>See</u> <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005) (opinion that claimant is "disabled" or "unable to work" involves issue reserved for ALJ and is not type of opinion given controlling weight). Bassin's opinions were accorded some weight but greater weight was accorded Gibbard's opinions, and the Court cannot say that the ALJ erred in doing so.

Given the foregoing, the ALJ could and did find that Hall has mental impairments impacting his residual functional capacity. The ALJ crafted an assessment of Hall's residual functional capacity that limited him to unskilled work, and Hall has not shown that the ALJ erred in doing so.

Hall offers a second reason why the ALJ's findings are not supported by substantial

evidence on the record as a whole. Hall maintains that the ALJ erred when he relied upon the vocational expert's answer to a hypothetical question not conforming to Hall's residual functional capacity.

Testimony from a vocational expert is substantial evidence on the record as a whole if "the testimony is based upon a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The hypothetical question must therefore include all of a claimant's impairments that are substantially supported by the record as a whole. See Id. at 1278-79.

The ALJ posed a series of hypothetical questions to a vocational expert. See Transcript at 984-988. In the second question, the ALJ identified an individual of Hall's age, education, work experience, and residual functional capacity to perform a restricted range of light work. The ALJ additionally incorported several non-exertional restrictions into the question. The vocational expert testified that there was work such an individual could perform. The ALJ then asked three hypothetical questions that incorporated several additional restrictions, e.g., anxiety, stress, absenteeism, tardiness, an inability to have contact with co-workers and supervisors. The vocational expert testified that the additional limitations would preclude all work. The ALJ relied upon the vocational expert's answer to the second question and found that there was work Hall could perform.

-14-

The ALJ did not err in relying upon the vocational expert's answer to the second hypothetical question. It was adequately phrased and captured the concrete consequences of Hall's physical and mental limitations. The ALJ could and did choose to not rely upon the vocational expert's answers to the third, fourth, and fifth questions because those questions contained restrictions not supported by substantial evidence on the record as a whole. As the Commissioner correctly maintains, the evidence supporting the additional restrictions is largely subjective, and the record as a whole does not support including the additional restrictions.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Hall's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 12th day of October, 2016.

_____
UNITED STATES MAGISTRATE JUDGE